Hattie HARRIS, Individually and as Administratrix of the Estate of Tjuana Yvette Obey, Deceased, Plaintiff,

v.

David K. MAPP, Jr., Defendant.

Civ. A. No. 86–961–N.

United States District Court,
E.D. Virginia,
Norfolk Division.

Aug. 11, 1989.

Jeffrey A. Breit, Breit, Drescher & Breit, Norfolk, Va., for plaintiff.

Andrew M. Sacks, Sacks & Sacks, Norfolk, Va., for defendant.

## MEMORANDUM OPINION AND ORDER

CLARKE, District Judge.

This matter comes before the Court on the plaintiff's Motion for Relief from Judgment and to Reopen this case. The plaintiff seeks to set aside this Court's Order of September 17, 1987 approving a settlement between the parties and dismissing the case with prejudice. She alleges that fraud and subornation of perjury on the part of the defendant entitle her to relief from judgment under Rule 60(b)(3) of the Federal Rules of Civil Procedure. For the reasons discussed below, the Motion is DENIED.

### Background

This case arises from the death of plaintiff's decedent, Tjuana Obey, on November 26, 1984 in the Norfolk City Jail. The most basic facts surrounding her death are not in dispute. Ms. Obey, an epileptic, was an inmate in the Norfolk City Jail; the jail medical personnel were aware of her condition. Shortly after midnight on November 26, she suffered a seizure in her cell. The physician's assistant at the jail administered a dose of Dilantin, her anti-seizure medication, and summoned the city Paramedic Rescue Service. The paramedics

examined Ms. Obey and eventually left without her. Sometime after 4:00 a.m., she suffered another seizure and a heart attack. The jail physician's assistant administered cardiopulmonary resuscitation, and the city paramedics returned almost immediately. However, they were unable to revive her, and she died at approximately 5:00 a.m.

The plaintiff, Ms. Obey's mother, filed a state court action against Sheriff David Mapp and others[1] alleging violations of 42 U.S.C. §§ 1983 and 1988 and seeking damages under the Virginia Wrongful Death Act, Va.Code Ann. §§ 8.01–50 to 8.01–56 (Michie 1984 & Supp.1989). The defendants removed the suit to this Court. Throughout the case, numerous discovery disputes arose between the parties. *See, e.g.*, Transcript of Hearing on Motions, Feb. 19, 1987. Plaintiff's counsel alleged that the defendant Sheriff Mapp was withholding documents and otherwise acting in bad faith. Counsel alluded to allegations of fraud and perjury in a separate case brought by plaintiff's counsel against the Sheriff. *See id.* at 6–9. After discovery was conducted, the plaintiff moved to name as a defendant Mariano S. Acevedo, a physician's assistant at the jail. This Motion was denied as untimely.

In September 1987, the Court conducted a hearing on a proposed settlement of the suit for the benefit of Ms. Obey's minor child. At the settlement hearing, plaintiff's counsel stated that the plaintiff had attempted to adduce evidence that the jail personnel should have recalled the city paramedics or themselves taken Ms. Obey to the hospital before 4:00 a.m. Transcript of Settlement Proceedings, Sept. 17, 1987 at 8. He advised the Court, however, that the evidence developed through discovery tended to show that Ms. Obey's condition between midnight and 4:00 was not such that

jail employees would have had notice of potential new problems, that the jail employees had acted properly and that Ms. Obey would have received essentially the same treatment at the hospital. *Id.* at 8–9. He concluded that the plaintiff "had a proximate cause problem that was second to none." *Id.* at 10. The Court approved a settlement payment of $19,500, and the parties executed a broadly worded settlement agreement and release of all claims against the defendants relating to Ms. Obey's death. The Court entered an Order dismissing the suit with prejudice.

In June 1988, the plaintiff filed the present Motion to set aside the judgment on the grounds that the defendant had committed fraud, perjury and other misconduct in the course of discovery. The plaintiff submitted the affidavit of the jail physician's assistant, Mr. Acevedo, who alleged that he and other jail medical personnel had altered Ms. Obey's medical records and that Sheriff Mapp had told him what to say in his original deposition in this case. The plaintiff also offered the deposition of William Burtt, a Norfolk city police officer and former deputy sheriff, who stated that Sheriff Mapp had induced him to lie about his knowledge of the incident at his first deposition, on pain of losing his job. Both parties have conducted discovery regarding this Motion.

On July 13, 1989, the Court held an evidentiary hearing, taking testimony from Mr. Acevedo, Officer Burtt and various defense witnesses. The Court has before it the hearing record, the exhibits and Court files, and the briefs of the parties.[2] Accordingly, the plaintiff's Motion is ripe for decision.

### The Hearing Evidence

Former jail physician's assistant Mariano Acevedo testified for the plaintiff at the

---

**1.** The only other named defendant, Deputy Sheriff Ramona Thompson, was dismissed from this case without objection at the evidentiary hearing. Accordingly, Sheriff Mapp is the sole remaining defendant in this case.

**2.** The defendant has filed a Motion to Strike the plaintiff's brief, or portions thereof, on the grounds that the plaintiff improperly submitted additional evidentiary material with the brief

after the close of the evidentiary hearing. Certain of these materials are already in the Court's files and will therefore be considered. However, with the exception of the affidavit of plaintiff's counsel, the Court has not considered any of the new evidentiary material. The particular documents submitted are discussed further below.

hearing. He stated that he contacted plaintiff's counsel in January 1988 after he was discharged from his job at the jail to discuss the possibility of filing an action against the Sheriff for wrongful discharge. Transcript of Evidentiary Hearing, July 13, 1989 at 23 [hereinafter Hearing Transcript]. After being advised that he had no legal recourse for his discharge, Mr. Acevedo then told plaintiff's counsel that he had to "clear my conscience," *id.*, and revealed that he had altered documents and committed perjury in his deposition in the original proceedings in this case.

Mr. Acevedo testified that he was on duty on the night that Ms. Obey died and was called to the women's cell block by the matron at about midnight. *Id.* at 45. He recognized that Ms. Obey was having an epileptic seizure and gave her an injection of 100 milligrams of Dilantin. *Id.* He told Deputy Burtt to call the city paramedics, who arrived about 20 minutes later. *Id.* at 45–46. At that time, he said, Ms. Obey was "semiconscious," *id.* at 46, but "she was getting better." *Id.* at 82. The city paramedics asked Ms. Obey to go to the hospital but she refused, and the paramedics left the jail without her. *Id.* at 46–47. He testified that in his view, however, she was still incoherent and unable to understand what she was doing or to respond intelligently to the paramedics' questions. *Id.* at 46.

Mr. Acevedo said that he tried to insist that the paramedics take Ms. Obey to the hospital, *id.* at 46, but admitted that it did not occur to him to exercise his own authority to forcibly remove her and take her to the hospital. *Id.* at 75–78. He expressed his view that the paramedics neglected Ms. Obey by failing to take her to the hospital. *Id.* at 49.

Sometime after 4:00 a.m., Ms. Obey suffered another seizure, and Mr. Acevedo again summoned the city paramedics. At that time, her condition was "grave . . . like a coma." *Id.* at 82. She apparently suffered a heart attack and died at approximately 5:00 a.m., while the city paramedics were treating her. *Id.*

During the morning after she died, Mr. Acevedo told Sheriff Mapp that Ms. Obey had refused to go to the hospital. *Id.* at 30. Before he spoke to the Sheriff, he also told the police officer investigating the incident that Ms. Obey had been given her medication on a regular basis. *Id.* at 73. He later admitted that this information was untrue but that he said it "to cover up something. . . . I don't want to . . . put our department in jeopardy." *Id.* at 73–74. He stated that he was "worried about malpractice suits," especially because he was on duty at the time of her death. *Id.* at 84–85.

Mr. Acevedo testified that, in April 1987, Sheriff Mapp drove him to an attorney's office for a deposition regarding Ms. Obey's death. *Id.* at 27. The Sheriff told him that, during the deposition, he should "not inflect [sic] the people involved, the Sheriff and the paramedics with me in the city jail," and that he should not reveal that they had discussed his testimony. *Id.* He told the Sheriff that the paramedics had neglected her, *id.* at 28, but the Sheriff told him to "stick to your story" that she refused to go. *Id.* Mr. Acevedo testified that he believed he would lose his job if he did not testify that Ms. Obey refused to go to the hospital. *Id.* at 29. He stated the only information that the Sheriff wanted him to leave out of his testimony was that the city paramedics neglected her. *Id.* at 84.

He also described a meeting of the jail physician's assistants called by the chief physician's assistant, Mr. Del Rosario, in March 1987, shortly before Mr. Acevedo's deposition. *Id.* at 33. As they discussed, the medical department's performance "wasn't too good, and we would like to minimize our mistakes. We—we would like that there will be no malpractice suits against us, so we have to do the right thing." *Id.* at 34. Mr. Del Rosario produced the original of Tjuana Obey's prescription drug inventory card, the document the medical department uses to record an inmate's medications. He instructed the physician's assistants to make a new version of the card to show that Ms. Obey had been receiving Dilantin three times daily as prescribed. *Id.* at 34–36. Mr. Acevedo testi-

fied that it was necessary to redo the card for use in his deposition "[b]ecause the medication that she supposed [sic] to take was not given at the proper, you know, time. It was given in spurts. Sometimes it was missed." *Id.* at 35. He stated that he participated in altering the card to protect his job. *Id.* at 64. He also admitted that he had no knowledge that Sheriff Mapp had any involvement in the alteration of the card. *Id.* at 60–63.

To support Mr. Acevedo's testimony that the card had been altered, the plaintiff introduced the jail's back door log for the subject time period. Mr. Acevedo testified that the physician's assistants were required to enter through the back door and log in when they reported for work. *Id.* at 43–44. As will be discussed further below, the log purported to show that physician's assistant Felton, who was shown on the card as having administered medication to Ms. Obey on the two days before she died, in fact did not work that weekend. *Id.* at 50–51.

Mr. Acevedo also testified concerning his nursing notes, a purportedly contemporaneous record of Ms. Obey's care. Tr. at 65–74, 85–91. Mr. Acevedo has some difficulty with the English language, and his testimony on this point was a source of considerable confusion at the hearing.[3] It appears that Mr. Acevedo prepared rough notes during the incidents involving Ms. Obey. Late in the morning after she died, *id.* at 88, he rewrote the nursing notes in a neater form and revised them to correspond with his affidavit about the incident that had been typed that morning by the Sheriff's secretary. *Id.* at 68, 70, 86–88. This story is in direct conflict with Mr. Acevedo's testimony at a deposition in January 1989, when he stated that he made the nursing notes at the time of the events recorded. *Id.* at 69.

Officer William Burtt, a Norfolk patrolman, was a deputy sheriff on duty at the jail on the night that Ms. Obey died. He testified that he was called to Ms. Obey's cell block to help get her up so that she could be taken to the hospital. Hearing Transcript at 94. When he arrived at her cell, Ms. Obey was lying on the floor and was "semi-coherent." *Id.* at 95. After several attempts, he and two other deputies raised Ms. Obey, who weighed well over 300 pounds, from the floor to a sitting position on a bench. *Id.* at 98–100. Officer Burtt testified that she offered them no assistance, *id.* at 99, and that she was in no condition to understand or respond to questions from the paramedics. *Id.* at 101–02. After the decision was made not to transport Ms. Obey to the hospital, the deputies lowered her back to the mattress on the floor. *Id.* at 102. Officer Burtt remained in the cell for 10 to 15 minutes; during this time, Ms. Obey remained in the same condition, semi-coherent and with her eyes closed. *Id.* at 102–03.

Officer Burtt was subpoenaed for a deposition in this case on April 16, 1987. Shortly before the deposition, he testified, Sheriff Mapp called him to his office at the jail. *Id.* at 106. The Sheriff asked him what happened on the night of Tjuana Obey's death, and Officer Burtt told the story as recited above. On hearing his story, Officer Burtt testified, the Sheriff "cursed [him] out" and told him that such information was what the plaintiff was looking for and that Officer Burtt himself could be sued. *Id.* at 107–08. The Sheriff then told him, "[t]his is what happened."

> He stated that I went up on the floor after being summonsed to the eighth floor, that my job there was to be security of the cell block. I had to keep the inmates back, you know, at a safe distance from what the paramedics was [sic] doing. I didn't see anything that happened, I didn't hear anything that

---

**3.** The plaintiff submitted with her brief an affidavit from Mr. Acevedo attempting to explain this point and a copy of his original nursing notes, which Mr. Acevedo stated he discovered in his files only after the hearing. The plaintiff and defendant disagree sharply over whether this material was properly submitted. As discussed further below, the plaintiff has presented no evidence that the defendant was involved with the alteration of any documents. Accordingly, this additional material is immaterial to the present Motion and will not be considered.

happened, and I didn't know anything that happened. *Id.* at 108.

The Sheriff asked him again what happened, and Officer Burtt repeated the story that he knew nothing about the incident other than that he helped raise Ms. Obey off the floor. The Sheriff "appeared to be happier that, you know, I picked up on what he had told me." *Id.* at 109. The Sheriff again told him that Officer Burtt would be personally liable for failing to take Ms. Obey to the hospital. *Id.* He told Officer Burtt "that if I didn't say the right thing, that hand him my badge and ID card once I left the deposition because I'd be fired." *Id.* at 110–11. The Sheriff also told him not to reveal that they had discussed his testimony before the deposition. *Id.* at 110.

Sheriff Mapp was present at Officer Burtt's deposition, in which he testified in the manner suggested by the Sheriff. *Id.* at 112–13.

Officer Burtt testified that he worked as a deputy sheriff until October 1987, when the Sheriff gave him the choice of resigning or being fired. *Id.* at 118–19. The Sheriff told Officer Burtt that he was "a security risk;" Officer Burtt believed he was discharged because the Sheriff learned that he had applied for a job with the Norfolk Police Department. *Id.* at 119–22. He admitted to making derogatory comments about the Sheriff's Department since his discharge and employment as a city police officer, *id.* at 139–41, but denied that he had a "vendetta" against Sheriff Mapp. *Id.* at 148.

Officer Burtt also testified that the Sheriff had lodged two complaints against him with the police department based on the derogatory remarks and other allegedly unprofessional conduct. *Id.* at 123–25. He stated that these complaints were investigated and determined to be unfounded. *Id.* at 125.

Officer Burtt testified that he did not disclose his true knowledge of the case until early 1989, when he was interviewed by the FBI. *Id.* at 144–45. At about this same time, Mr. Acevedo called him to discuss the case and ask him to come forward. *Id.* at 145–46. Officer Burtt said he and Mr. Acevedo had discussed this case several times. *Id.* at 147.

Norfolk Police Investigator Charles Moore[4] testified that he arrived at the jail about 15 minutes after Ms. Obey was pronounced dead; his function was to investigate the incident and provide information for the Medical Examiner. Hearing Transcript at 158–59. He interviewed Mr. Acevedo, several deputies on duty and a number of inmates. *Id.* at 163. Based on his investigation, he informed the Medical Examiner that Ms. Obey had received 100 milligrams of Dilantin at the time of the first seizure and that she had refused her regular medication at approximately 4:30 a.m. *Id.* at 166–67. The inmates informed him that Ms. Obey had "just flat refused to go" to the hospital. *Id.* at 168.

Investigator Moore testified that his investigative file on Tjuana Obey's death disappeared twice. When he was called to give a deposition in the original proceedings in this case, he discovered that the file was missing from the homicide squad office. *Id.* at 173–75. He created a new file from memory; this second file also turned up missing. *Id.* at 175–76. He testified that these two files were the only files that he had ever lost in twelve years as a Norfolk police officer. *Id.* at 176. The current file contains notes that Investigator Moore again compiled from memory and the original offense report, a brief document containing the "bare bones" information of the case. *Id.* at 178–80. The file is now kept under lock and key by the head of the homicide squad. *Id.* at 179.

Dr. Richard Cullen was the local Medical Examiner[5] who was called in after Ms.

---

**4.** Investigator Moore, a homicide detective testified that he was investigating the incident because any death in the jail, regardless of circumstances, automatically becomes a Medical Ex-

aminer's case that requires a police officer to gather information.

**5.** As a local Medical Examiner, Dr. Cullen is a private physician who is called in to assist the

Obey's death. He prepared a report based largely on the information gathered by Investigator Moore. Hearing Transcript at 183–86. He concluded that she died from cerebral hypoxia, or lack of oxygen to the brain, as a result of the seizure. *Id.* at 189.

Dr. Cullen testified that he understood Ms. Obey was receiving 400 milligrams of Dilantin daily. *Id.* at 190. It is "absolutely important" to maintain an epileptic patient's Dilantin level to reduce the likelihood of seizures, he said. He testified that the greatest cause of epileptic seizures is failure to take prescribed medication, but that some patients may have seizures despite their medication. *Id.* at 192–93. He also expressed his opinion that a daily dosage of 400 milligrams of Dilantin would probably be insufficient for a patient such as Ms. Obey, who weighed 378 pounds. *Id.* at 192–93.

Norman Pool, a paramedic for the City of Norfolk, was one of the paramedics called to the jail on the night Ms. Obey died. He testified that, when they arrived in her cell, Ms. Obey was lying face down on the floor but, "[s]he was responsive, she roused real easily." *Id.* at 196. He stated that she was able to sit and stand with a little assistance, that she was conscious and knew where she was and that she answered their questions appropriately. *Id.* According to Mr. Pool, the paramedics spent 20 minutes trying to convince Ms. Obey to go to the hospital, but she refused. *Id.* at 196–97. He testified that, in his opinion, she was not so incapacitated or unresponsive that she should be removed to the hospital despite her refusals. *Id.* at 197.

Mr. Pool disagreed that Ms. Obey was either semiconscious or unconscious when the paramedics arrived. *Id.* at 198. He testified that he informed Mr. Acevedo that she had refused to go, and Mr. Acevedo said to "leave her there." *Id.* at 201.

Sheriff Mapp testified that he had no involvement with or knowledge of any alteration of Ms. Obey's prescription card. Hearing Transcript at 217. He flatly denied the statements of Mr. Acevedo and Officer Burtt that he instructed them to testify falsely at their depositions. *Id.* at 217–18. He confirmed that he had lodged complaints against Officer Burtt with the Chief of Police but stated that he was never questioned about them and did not know what their eventual disposition was. *Id.* at 220–23.

He further denied that the back door log was used to check employees in and out of the jail. *Id.* at 223. He stated the logbook is "strictly for the deputies, and it's taken off a roster that the shift command actually places on a—the back door, for the deputy to put the various shift deputies in the logbook. This logbook is not used for any other treatment personnel." *Id.* at 225. Sheriff Mapp stated that the paramedics do not use the second floor roster to check in and out of work but was unable to explain why the paramedics' names and entry and exit times were recorded in the log. *Id.* at 235–36. He testified that the jail's medical department is under the direction of a physician and that the Sheriff has no involvement with the work schedules or daily activities of the physician's assistants. *Id.* at 241–42.

The defendant also presented testimony from Mr. Gregory Stillman, counsel for the defendant during the settlement negotiations. He testified regarding the evidence at the time of settlement, the negotiations, and his understanding of the scope of the release. Hearing Transcript at 204–14.

*Plaintiff's Allegations*

The plaintiff alleges four separate acts of misconduct by the defendant that she asserts entitle her to relief from judgment: the alteration of Ms. Obey's prescription drug inventory card, the withholding of the back door log, the perjury of Mr. Acevedo and the perjury of Officer Burtt. At the evidentiary hearing, counsel for the plaintiff represented to the Court that the plaintiff would not have agreed to the settlement amount if the true facts had been known.

city's Chief Medical Examiner. Hearing Tran-    script at 181–83.

## Discussion
### Rule 60(b)

Rule 60(b)(3) of the Federal Rules of Civil Procedure provides that a court may relieve a party from a final judgment or order on the grounds of "fraud (whether heretofore denominated intrinsic or extrinsic), misrepresentation, or other misconduct of an adverse party." A motion under this section must be made within one year of the judgment or order. In evaluating a motion under Rule 60(b), "the court must balance the competing policies favoring the finality of judgments and justice being done in view of all the facts, to determine, within its discretion, whether relief is appropriate in each case." *Square Constr. Co. v. Washington Metro. Area Transit Auth.*, 657 F.2d 68, 71 (4th Cir.1981).

■ A party seeking relief from judgment must, as a threshold matter, demonstrate the existence of a meritorious claim or defense. *Id.* A movant seeking relief under subsection (b)(3) must prove by clear and convincing evidence fraud or misconduct that prevented him from fully and fairly presenting his claim or defense. *Id.* The movant must also prove that the misconduct complained of is traceable to an adverse party. *Metlyn Realty Corp. v. Esmark, Inc.*, 763 F.2d 826, 832 (7th Cir. 1985).

■ The withholding of discovery information may be grounds for relief under Rule 60(b)(3). *See, e.g., Stridiron v. Stridiron*, 698 F.2d 204 (3d Cir.1983); *Square Constr. Co.*, 657 F.2d 68; *Rozier v. Ford Motor Co.*, 573 F.2d 1332 (5th Cir.1978). A party's subornation of perjury will also be grounds for reopening a judgment when the perjury goes to the heart of the issue. *Metlyn Realty Corp.*, 763 F.2d at 832. In general, the misconduct must affect the movant's substantial rights. *Anderson v. Cryovac & Beatrice Foods Co.*, 862 F.2d 910, 924 (1st Cir.1988). Most courts have held that the perjury or information withheld need not be such as to alter the judgment, as the rule addresses judgments that

are unfairly obtained, not factually incorrect. *Rozier v. Ford Motor Co.*, 573 F.2d at 1339.

### Existence of a Meritorious Claim

■ As noted, the existence of a meritorious claim or defense is a threshold requirement for relief under Rule 60(b). In this case, the plaintiff has not established that she would have a meritorious claim against the defendant Sheriff Mapp if this case were reopened.

The sole claim that the plaintiff asserts is under 42 U.S.C. § 1983, based on the defendant's deliberate indifference to Ms. Obey's serious medical needs in violation of the eighth amendment. *See Estelle v. Gamble*, 429 U.S. 97, 104, 97 S.Ct. 285, 291, 50 L.Ed.2d 251 (1976). The plaintiff alleges first that the jail employees were deliberately indifferent to her medical needs by failing to administer her medication properly and by failing to transport her to a medical facility for further treatment. It is axiomatic that mere negligence or malpractice does not state a constitutional claim. *Estelle v. Gamble*, 429 U.S. at 106, 97 S.Ct. at 292; *Sosebee v. Murphy*, 797 F.2d 179 (4th Cir.1986). In this case, the plaintiff has made no showing that the jail employees were deliberately indifferent to Ms. Obey's medical needs or that any of their acts proximately caused her death.

The undisputed evidence is that the jail physician's assistant was summoned promptly when Ms. Obey suffered her first seizure and that his treatment of her was essentially proper.[6] He checked on Ms. Obey's condition periodically throughout the night, and the city Paramedic Rescue Service was called immediately upon both seizure episodes. By the admission of plaintiff's counsel at the settlement hearing, the evidence showed that Ms. Obey was sleeping peacefully between midnight and four a.m. Further, Mr. Acevedo testified that the medical department did not deliberately withhold her medication but

6. The city paramedic, Mr. Pool, testified that the Dilantin that Mr. Acevedo administered to Ms. Obey shortly after midnight should not have been given by use of a hypodermic needle. Hearing Transcript at 198.

merely that the employees occasionally failed to give it at the proper times.

Arguably, the plaintiff has created an issue as to whether the jail employees were negligent in improperly administering Ms. Obey's medication and failing to take her to the hospital after her first seizure. However, the plaintiff has presented no evidence that the medical department's actions amounted to deliberate indifference to her medical needs. In addition, the Sheriff would not be vicariously liable for the Section 1983 violations of his subordinates. *Monell v. Department of Social Services,* 436 U.S. 658, 98 S.Ct. 2018, 56 L.Ed.2d 611 (1978).

The plaintiff also asserts that the Sheriff had a policy and practice of covering up wrongdoing in the jail and that this policy constituted deliberate indifference to her medical needs. This argument is also without merit. In certain cases, a pattern of deliberate cover-ups may be evidence of a condonation of wrongful activity for the purpose of establishing municipal liability. *See Spell v. McDaniel,* 824 F.2d 1380, 1394–95 (4th Cir.1987) (holding that deliberate cover-up of incidents of police brutality was evidence of police chief's condonation of practice of using excessive force), *cert. denied,* —— U.S. ——, 108 S.Ct. 752, 98 L.Ed.2d 765 (1988). In *Spell,* the evidence showed that a policy of covering up wrongdoing, along with disregard of incidents and positive encouragement of violence, fostered the use of the excessive force complained of by the plaintiff.

The plaintiff relies on *Webster v. City of Houston,* 689 F.2d 1220 (5th Cir.1982), *reversed on rehearing en banc on different grounds,* 735 F.2d 838 (5th Cir.1984). In *Webster,* the plaintiff's decedent, an unarmed seventeen-year-old, was shot and killed by police in the course of an arrest. Police officers placed a weapon at his side to justify the killing, and the department covered up this fact during the resulting investigation. The court found that the use of such "throw down" weapons to conceal police misconduct was pervasive in the police department and that this policy and practice effectively encouraged the use of unlawful force. *Id.* at 1227. In this case, however, the plaintiff has not shown that any expectations of a cover-up encouraged the medical department to be indifferent to Ms. Obey's medical needs.[7] Moreover, as noted above, the plaintiff's evidence does not establish deliberate indifference.

Finally, the plaintiff argues that the Sheriff's failure to train, supervise and control jail employees amounted to deliberate indifference to Ms. Obey's needs. A failure to train law enforcement officers may be the basis for municipal liability only in those cases "where the failure to train amounts to deliberate indifference to the rights of persons with whom the police come into contact." *City of Canton, Ohio v. Harris,* —— U.S. ——, ——, 109 S.Ct. 1197, 1199, 103 L.Ed.2d 412 (1989).[8] In such cases, the plaintiff has the burden of proving that the city's training program is inadequate, that the inadequacy amounts to a city policy and that the identified deficiency in the training program is closely related to the ultimate injury. *Id.* at —— - ——, 109 S.Ct. at 1199–1200.

In this case, the plaintiff can identify no particular deficiency in the training of the jail physician's assistants or deputies that

---

7. The plaintiff also argues that the alleged cover-up deprived her of her due process right of access to the courts and therefore may be the basis of a Section 1983 claim. *See Bell v. City of Milwaukee,* 746 F.2d 1205, 1261 (7th Cir.1984) (holding that police conspiracy to cover up a "throw down" incident created right of action in decedent's survivors). However, such a claim was not part of the plaintiff's original action. In deciding a Motion under Rule 60(b)(3), the Court must consider only the issue of whether the plaintiff was denied the opportunity to fully and fairly present her claims in the litigation that she now seeks to reopen.

8. The plaintiff's reliance on this case to impose liability on the Sheriff is inapposite in any event. In Virginia, a Sheriff and his employees are not regarded as city employees. The Sheriff is an elected official whose position is created by the Virginia Constitution and whose duties are regulated and defined by state statute. Va. Const. Art. VII, § 4; Va.Code Ann. §§ 15.1–74 to 15.1–90.4 (Michie 1989). Accordingly, the principles governing municipal liability under Section 1983 are inapplicable to suits against the Sheriff.

contributed to Ms. Obey's death. She merely points to the Sheriff's alleged cover-up of his employees' deliberate indifference, which has previously been discussed, and his lack of knowledge of the activities of the medical department. However, the evidence showed that the medical department was under the direct supervision of a physician who was responsible for day-to-day activities; the Sheriff's lack of personal knowledge of the department's workings cannot be said to indicate that its employees were inadequately supervised or controlled.

Although the Court finds that the plaintiff would not have a meritorious claim against the defendant if this case were reopened, the Court will address the remaining elements required for relief under Rule 60(b)(3).

*Evidence of Fraud or Misconduct*

As noted above, relief under Rule 60(b)(3) requires clear and convincing evidence of fraud or other misconduct on the part of an adverse party that prevented the movant from fully and fairly presenting his claim.

■ The first instance of fraud to which the plaintiff points is the alleged alteration of Ms. Obey's prescription card. Mr. Acevedo's testimony that he and others in the medical department falsified the card was uncontradicted at the evidentiary hearing. However, Sheriff Mapp denied any involvement with the falsification and Mr. Acevedo himself admitted that he had no knowledge that the Sheriff was involved. In fact, Mr. Acevedo testified that he felt it was necessary to alter the card to protect the medical department from a potential malpractice suit. Moreover, he lied to Investigator Moore about Ms. Obey's medication before he even spoke to Sheriff Mapp about her death, again to protect himself and the medical department.

There is simply no evidence to tie this misconduct to an adverse party—that is, to Sheriff Mapp.

■ The plaintiff next alleges that the defendant's withholding of the back door log constituted misconduct that entitles her to relief from judgment. This contention is somewhat more problematic than the first. At the evidentiary hearing, Sheriff Mapp testified that the log was made available to the plaintiff during the original discovery proceedings in this case. Hearing Transcript at 245–47. Although plaintiff's counsel did not challenge this statement, he later submitted an affidavit [9] averring that the log was not produced until February 1989, in response to a Request for Production of Documents seeking records showing who was employed at the jail between November 20 and November 26, 1984. A review of the Court's files shows that this request was not covered by the categories in the plaintiff's original Request for Production of Documents which was filed in the state court in December 1986 and later made a part of this Court's records. The correspondence between counsel does not list the log as among the documents specifically made available to the plaintiff; on the other hand, neither does it reflect that this document was specifically demanded. During discovery in this case, plaintiff's counsel was granted broad access to the Sheriff's Office to review documents and request materials. The plaintiff has not presented clear and convincing evidence that the defendant deliberately withheld the log.

Moreover, any failure to produce the back door log did not prevent the plaintiff from fully and fairly presenting her claim. The log's only relevance to the claim is to support the allegation that Ms. Obey's prescription card was altered and, impliedly, that her medication had not been adminis-

---

**9.** The affidavit of plaintiff's counsel and various supporting documents and correspondence were among the materials appended to the plaintiff's brief as to which the defendant objected. As discussed previously, the Court has not considered other evidentiary materials submitted by the plaintiff after the hearing. However, the Court is willing to consider this affida-

vit as containing the representations of counsel of record in this case. The Court will disregard the other materials submitted in support of Mr. Breit's affidavit and will rely on the Court's file, which contains copies of the extensive correspondence between counsel during the original discovery proceedings in this case.

tered properly. The plaintiff could, and did, depose the paramedics whose initials appeared on the prescription card; she could have questioned them regarding their work schedules to confirm the accuracy of the records. Similarly, the Women's Daily Log (introduced at the hearing as Plaintiff's Exhibit 2) indicates which jail personnel administered medication at various times and could have been compared to the prescription card to determine its accuracy or authenticity. The information contained in the log was clearly available to the plaintiff, and any withholding of the log did not prevent her from fully presenting her claim. *See, e.g., Bunch v. United States,* 680 F.2d 1271, 1283 (9th Cir.1982) (denying 60(b)(3) relief where plaintiff was aware of information contained in allegedly withheld material).

In addition, the Court is mindful of the fact that, during the often bitter discovery disputes between the parties in this case, plaintiff's counsel frequently accused the defendant of deliberately withholding documents. It is clear that the plaintiff was on notice of the possibility that other documents existed but agreed nonetheless to a broad release and settlement. Accordingly, the alleged withholding of the log should not now be grounds for setting aside the settlement Order.

■ The plaintiff next asserts that Sheriff Mapp suborned Mr. Acevedo's perjury in his first deposition. Mr. Acevedo's testimony on all aspects of this case was confused and occasionally contradictory and was often the product of leading questions by plaintiff's counsel. His statements regarding his conversations with Sheriff Mapp were flatly denied by the Sheriff. Mr. Acevedo admitted lying to the police investigator even before he spoke with Sheriff Mapp, in order to protect himself and his department. He did not come forward with his present allegations until after he learned he had no legal recourse for his discharge by the Sheriff. All in all, his testimony lacks sufficient clarity and credibility to constitute convincing evidence of fraud.

Moreover, Mr. Acevedo testified that Sheriff Mapp had only told him not to say that the city paramedics had neglected Ms. Obey and to "stick to his story" that she had refused to go to the hospital. Mr. Acevedo's view of the alleged negligence of the city paramedics—nonparties to this action—is merely an opinion; a false statement of opinion rather than facts cannot be said to be perjury sufficient to justify relief under Rule 60(b)(3). *See Keys v. Dunbar,* 405 F.2d 955, 958 (9th Cir.), *cert. denied,* 396 U.S. 880, 90 S.Ct. 158, 24 L.Ed.2d 138 (1969). Similarly, Mr. Acevedo admitted that he originally told Sheriff Mapp that Ms. Obey had refused to go to the hospital. The Sheriff's advice to Mr. Acevedo to "stick to" his original, uncoerced recitation of the incident is not necessarily subornation of perjury.

In short, Mr. Acevedo's testimony that the Sheriff induced him to commit perjury falls far short of the clear and convincing evidence standard.

■ The plaintiff's final allegation is the most troubling. Officer Burtt, a Norfolk police officer, testified that Sheriff Mapp threatened him with the loss of his job if he refused to perjure himself in his first deposition. Officer Burtt was a credible witness who did not appear to be hostile toward the defendant or otherwise have improper motives. Although Officer Burtt was eventually discharged by the Sheriff and has admitted to making derogatory remarks about him, the Court is unconvinced that he has a "vendetta" against the Sheriff, as the defendant asserts. It is difficult to believe that a police officer would admit to the Court, to his superiors at the police department and to the FBI that he had committed perjury, merely because of some allegedly ill feeling between himself and his former employer.

Again, however, Officer Burtt's testimony is flatly contradicted by the Sheriff. In addition, his description of Ms. Obey's condition after her first seizure—the subject of his allegedly perjured testimony at the first deposition—is squarely contradicted by the testimony of Paramedic Pool, a disinterested party. Officer Burtt's testimony

is also at least somewhat subject to question based on his admission that he discussed this case with Mr. Acevedo more than once before he came forward.

In short, Officer Burtt's testimony is disturbing but the Court cannot say that it is clear and convincing evidence of fraud on the part of the Sheriff.

### Conclusion

This case is replete with suspicious circumstances: police files have disappeared, documents have been altered, witnesses have confessed to lies and perjury. The Sheriff's own testimony was at times murky, even evasive, and showed at best a lack of knowledge of such basic information as how employees check in and out of the jail.

However, this case is before the Court on a Motion for Relief from Judgment. The time-honored principles favoring the finality of judgments and an end to litigation require high standards of proof for a party seeking to set aside a final judgment and reopen a lawsuit. This Court is constrained to apply these standards and must conclude that the plaintiff has not presented clear and convincing evidence of fraud on the part of the Sheriff that has prevented her from fully and fairly presenting a meritorious claim.

Accordingly, the plaintiff's Motion for Relief from Judgment is DENIED, and this case is hereby DISMISSED.

IT IS SO ORDERED.